UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| PDVSA PETROLEO S.A., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-09-38 |
| | § | |
| TRIGEANT, LTD., *et al*, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This suit arose out of the transfer of an asphalt refinery located in Corpus Christi, Texas from Defendant Trigeant, Ltd. to Defendant BTB Refining, LLC. (BTB) through a foreclosure sale on March 4, 2008.  Plaintiff alleges that the transfer was constructively and actually fraudulent under the Texas Uniform Fraudulent Transfer Act (TUFTA). This cause proceeded to a bench trial, which concluded on May 21, 2012.  Pursuant to FED. R. CIV. P. 52(a), after hearing all the evidence, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### A.    Parties

1.    Plaintiff PDVSA Petroleo S.A. is a business entity formed and existing under the laws of the Bolivarian Republic of Venezuela, with its principal place of business in Caracas, Venezuela.  Its principal business activities include producing, supplying, and selling crude oil and other petroleum products around the world.

2.    Trigeant, Ltd. is a limited partnership.  It has a single general partner, Trigeant, LLC.  Steve Roos served as the manager of Trigeant, LLC and was also in charge of operations at Trigeant, Ltd.'s Corpus Christi refinery.

3.    From March 6, 2007 through April 13, 2008, Trigeant Holdings, Ltd. owned 98.9% of Trigeant, LLC.  Trigeant Holdings, Ltd. was 99% owned by Harry Sargeant, III, James Sargeant, Daniel Sargeant, and Harry Sargeant, II.

4.    Trigeant Holdings, LLC was the general partner of, and therefore, in control of Trigeant Holdings, Ltd.  Harry Sargeant, III was the manager of Trigeant Holdings, LLC.

5.    From March 6, 2007 through April 13, 2008, Harry Sargeant, III, Daniel Sargeant, and Harry Sargeant, II each owned 29.25% of Trigeant Holdings, LLC and James Sargeant owned 12.25%.

6.    BTB was formed on December 10, 2007.  Harry Sargeant, III is the 100% owner and sole member of BTB.  Harry Sargeant, III exercises exclusive control over BTB.

**B.    First and Second Arbitration Proceedings**

7.    In December 2002, Plaintiff and Trigeant, Ltd. entered into a Supply Agreement for the supply of crude oil to Trigeant, Ltd.'s Corpus Christi refinery.

8.    Soon after, the Supply Agreement was suspended when a strike in Venezuela caused Plaintiff to invoke the agreement's force majeure clause.

9.    During the period of time when the Supply Agreement's force majeure clause was invoked, Plaintiff sold Trigeant, Ltd. three shipments of crude oil on the spot market.  In other words, the shipments of crude were not purchased pursuant to the Supply Agreement, but through an open commodities exchange.

10.   In April 2003, a dispute arose between the parties over the price to be paid for shipments of crude purchased under the Supply Agreement.

11.   On September 10, 2004, Plaintiff initiated arbitration proceedings against Trigeant, Ltd. (First Arbitration Proceedings) pursuant to the terms of the Supply Agreement.

12.   On March 10, 2006, Plaintiff obtained an arbitration award (First Arbitration Award) against Trigeant, Ltd. for approximately $17 million.  This First Arbitration Award resolved the parties' dispute with regard to the shipments of crude purchased pursuant to the Supply Agreement.

13.   Disputes remained, however, with regard to the three shipments of crude oil

purchased from Plaintiff on the spot market.  Plaintiff demanded payment for the shipments, and Trigeant, Ltd. claimed Plaintiff had committed antitrust violations.

14.   On August 29, 2007, Plaintiff initiated the Second Arbitration Proceedings against Trigeant, Ltd.

15.   On August 24, 2008, Plaintiff obtained a Second Arbitration Award against Trigeant, Ltd. for approximately $35 million. (P47.)  As of April 2012, the total amount owed by Trigeant, Ltd. on the Second Arbitration Award, including interest and costs, was approximately $47 million.

**C.    AmCap Loan**

16.   In the Fall of 2006, Trigeant, Ltd. utilized a mortgage broker, Blossom Street Capital, to find potential financing sources for an asset-backed loan which could be secured by a mortgage on its refinery.

17.   In December 2006, American Capital Financial Services, Inc. (AmCap) agreed to loan Trigeant, Ltd. $22 million in exchange for a lien on substantially all of Trigeant Ltd.'s assets, including a deed of trust on the refinery. (D12.)

18.   The refinery constituted Trigeant Ltd.'s primary asset.

19.   At this time, AmCap determined that the refinery alone had a liquidation value of $30 million.  AmCap believed the refinery and its assets were worth considerably more if properly marketed and sold at fair market value; however, if the refinery had to be foreclosed upon and sold at public auction, as a whole or in pieces, AmCap felt it could easily obtain $30 million.

20.   On December 15, 2006, Trigeant, Ltd. and AmCap signed a Credit Agreement memorializing the terms of the loan. (D13.)

21.   Trigeant, Ltd. was solvent at the time it executed the Credit Agreement, and the Credit Agreement did not cause it to become insolvent.

22.   The AmCap lien and deed of trust on the refinery was effective against the holder of any judicial lien subsequently obtained against Trigeant, Ltd.

23.   The proceeds from the loan helped Trigeant, Ltd. finance its payment of the First Arbitration Award, and on December 29, 2006, Trigeant, Ltd. paid Plaintiff $17,204,573 in full satisfaction of the First Arbitration Award.

24.     Trigeant, Ltd. and Plaintiff signed a Release and Satisfaction with regard to the First Arbitration Award. (D25.)

**D.     Trigeant, Ltd.'s Default on the AmCap Loan**

25.     On May 19, 2006, prior to entering into the AmCap loan agreement, Trigeant, Ltd. executed a Processing Agreement with Texas Asphalt Refining Company (TARCO).

26.     The Processing Agreement required that TARCO pay a fixed per barrel rate for processing crude at the refinery, and it required a minimum monthly quota which had to be paid regardless of whether any crude oil was processed.  This "take or pay" arrangement guaranteed Trigeant, Ltd. minimum annual revenue of $21.6 million.

27.     The TARCO Processing Agreement expired in May 2007.

28.     Trigeant, Ltd. continued to process crude for TARCO pursuant to the Processing Agreement and sought an extension of the agreement.  However, in the Fall of 2007, TARCO indicated that it would not renew the Processing Agreement because market forces had driven down profit margins to unacceptable levels.  There were also allegations that Trigeant, Ltd. soured the relationship by attempting to charge TARCO for capital improvements at the refinery.  At this point, Trigeant, Ltd. no longer had a secured revenue stream.

29.     As of result, Trigeant, Ltd. breached one of its financial covenants with AmCap.  This breach constituted an "event of default" under the Credit Agreement.

30.     By the third quarter of 2007, Trigeant, Ltd.'s financial picture had become unacceptable to AmCap.

31.     Steve Roos negotiated a cure to Trigeant, Ltd.'s loan default, but Trigeant Ltd.'s equity holders were unwilling to invest additional money in the business.  Therefore, Trigeant, Ltd. was unable to meet AmCap's requirements for the proposed debt restructuring.

32.     On October 9, 2007, AmCap formally notified Trigeant, Ltd. that the loan was in default and threatened foreclosure. (D35.)

33.     On November 8, 2007, AmCap formally notified Trigeant, Ltd. that it would accelerate the debt under the terms of the Credit Agreement. (D39.)

34.    On November 20, 2007, AmCap gave Trigeant, Ltd. notice that it intended to foreclose on the refinery. (D40.)

**E.    BTB's Purchase of the AmCap Loan and Lien**

35.    Following AmCap's notice of default in October 2007, Harry Sargeant, III approached the other Trigeant, Ltd. equity holders (James Sargeant, Dan Sargeant, and Harry Sargeant, II) to request permission to put together a deal on his own to take control of the refinery.  The equity holders granted Harry Sargeant, III permission to do so.

36.    Harry Sargeant, III approached his longtime business associate, Mustafa Abu Naba, about financing a NewCo to serve as an acquisition vehicle to purchase the refinery out of foreclosure.

37.    Mr. Abu Naba was a dominant purveyor of asphalt throughout the Caribbean, and the refinery would enhance the vertical integration of his businesses.  His businesses relied on third-party suppliers of asphalt, and he desired a preferred business relationship with an asphalt refinery on the Texas Gulf Coast.

38.    The refinery also provided vertical integration for Harry Sargeant, III's asphalt and crude oil shipping businesses which could increase profits.

39.    Control over the refinery permitted Harry Sargeant, III and his affiliated entities to obtain a preferred price from third-party asphalt suppliers.  With the ability to turn the refinery on and off, Harry Sargeant, III and his affiliated entities could influence market prices.  Asphalt suppliers would be willing to supply them with asphalt at a reduced price if they agreed not to produce.

40.    In October 2007, Harry Sargeant, III met with Myung Yi of AmCap to discuss the possibility of purchasing the refinery (after foreclosure by AmCap) through an entity either wholly or partially owned by Harry Sargeant, III.

41.    Kevin Kirkeide, who Harry Sargeant, III selected to manage the NewCo, also attended the meeting with Myung Yi.

42.    By November 19, 2007, the parties had reached a tentative agreement on the sale of the refinery.  The plan was for an entity controlled by Harry Sargeant, III to purchase the refinery from AmCap for the total outstanding balance of the loan following a publicly held foreclosure sale at which AmCap would enter a credit bid equal to all amounts due and owing under the loan at that time. (P82.)

43. On December 10, 2007, BTB was formed to serve as the acquisition vehicle for the refinery purchase.  Harry Sargeant, III was named the sole owner and member and had full control over the company's operations.

44. That same day, AmCap and BTB executed an Agreement Regarding Sale of Property and BTB deposited $8 million into an escrow account as a deposit on the refinery. (P99.)

45. Pursuant to the Agreement Regarding Sale of Property, AmCap agreed to foreclose on the property and enter a credit bid at the foreclosure sale.  If AmCap's credit bid constituted the highest bid at the foreclosure sale, AmCap agreed to designate BTB as the entity to take title to the refinery at closing.

46. BTB requested that the foreclosure sale be held on January 1, 2008 because it believed there would be less chance of other bidders on that day.

47. AmCap was only concerned about recouping its investment. It had no interest in maximizing the sale price of the refinery.  Because it had a guaranteed buyer, AmCap agreed to hold the sale on January 1, 2008.

48. AmCap no longer viewed Trigeant, Ltd. as a going concern because of the expiration of the TARCO agreement.  Nevertheless, AmCap still considered the refinery's liquidation value to be between $27.6 and $30 million.  AmCap believed it could obtain this amount through a forced sale of the refinery, either as a whole or broken up and sold off in its component pieces.  AmCap was confident that it could recoup the outstanding loan balance of approximately $22 million, with or without BTB. (P7.)

49. In the event that AmCap was not the highest bidder on January 1, 2008, the Agreement Regarding Sale of Property required AmCap to return the $8 million deposit to BTB.

50. Given the possibility that AmCap might be outbid at the public auction, BTB's strategy changed from purchasing the refinery to purchasing the loan and lien from AmCap.  By substituting itself as the foreclosing creditor, BTB would have more control over the foreclosure process and the outcome.

51. In early December 2007, BTB brought the idea of a note purchase to AmCap.  AmCap felt that this was the cleanest way for it to get paid so it agreed to the change in plan.

52. BTB and AmCap negotiated an Assignment and Acceptance Agreement through which AmCap would transfer the loan and lien to BTB.

53.  In exchange for AmCap's assignment of its rights and obligations under the Credit Agreement and Deed of Trust, BTB agreed to pay AmCap the outstanding loan balance ($22,364,562.06), less the amount of any interest payments made by Trigeant, Ltd. (P100.)

54.  On December 23, 2007, Harry Sargeant, III gave the go ahead for the note purchase. (P8, D129.)

55.  On December 27, 2007, Steve Roos of Trigeant, Ltd. made an interest payment to AmCap in the amount of $521,143.41. (P86.)  This resulted in a direct reduction of the purchase price of the AmCap loan for BTB.

56.  On December 28, 2007, BTB and AmCap executed the Assignment and Acceptance Agreement (P100), which superseded the Agreement Regarding Sale of Property, and BTB paid AmCap $21,828,446.65, which represented the outstanding balance on the note.

57.  BTB then cancelled the previously scheduled January 1, 2008 foreclosure sale.

**F.  BTB's Foreclosure on the Refinery**

58.  Following the sale of the AmCap loan and lien to BTB, Trigeant, Ltd. continued in default under the Credit Agreement.

59.  BTB did not offer Trigeant, Ltd. an opportunity to cure the default, nor did Trigeant, Ltd. propose any cure.

60.  There were never any discussions or negotiations between BTB and Trigeant, Ltd. regarding a rehabilitation plan.

61.  BTB never planned to rehabilitate Trigeant, Ltd.; rather, it intended to take control of the refinery through foreclosure.

62.  Harry Sargeant, III believed that once the TARCO processing agreement expired, Trigeant, Ltd. was essentially dead.

63.  Harry Sargeant, III and the other Trigeant, Ltd. equity holders were not interested in putting more money into Trigeant, Ltd.

64.  BTB initially rescheduled the foreclosure sale for February 5, 2008, the first Tuesday in February. (D190, D200.)

65.   BTB then rescheduled the foreclosure sale for March 4, 2008, the first Tuesday in March. (D193, D201.)

66.   On February 12, 2008, Skip Henkel, the substitute trustee, gave written notice to Trigeant, Ltd. that a non-judicial foreclosure sale would be conducted on March 4, 2008. (D193.)

67.   Notice of the public foreclosure sale was posted at the Nueces County Courthouse. (D207.)

68.   Notice of the foreclosure sale was published in the Coastal Bend Daily Legal & Business News on February 15, 2008. (D201.)

69.   Trigeant, Ltd. made no effort to maximize the sale price of the refinery: it did not retain a broker, it did not contact other interested buyers, and it did not advertise the sale.

70.   It was not in BTB's interest to publicize the sale because it wished to buy the refinery at the lowest possible price.

71.   On March 4, 2008, the substitute trustee conducted a public auction on the steps of the Nueces County Courthouse.

72.   BTB was the only bidder present at the sale.

73.   BTB placed a credit bid of $22,565,193.55, equal to all amounts due and owing under the loan at that time.

74.   The foreclosure sale was conducted in accordance with the provisions of the Texas Property Code, Section 51.002.

75.   Plaintiff did not learn about the foreclosure sale until after it occurred.

76.   BTB, Trigeant, Ltd., and Harry Sargeant, III initially concealed the foreclosure sale and the relationship between BTB and Harry Sargeant, III.

77.   The Port Authority of Corpus Christi did not learn of the sale until November 2008, when it received notice from U.S. Customs and Border Control.

78.   The neighboring Citgo refinery (a subsidiary of Plaintiff), which leased storage tanks from Trigeant, Ltd., did not learn about the change in ownership until January 2009 when there was an issue with its employees' access badges for the Trigeant, Ltd. refinery.

79. On May 26, 2008, at the Second Arbitration Proceedings before the International Court of Arbitration, Harry Sargeant, III testified that he did not have any interest in, control over, or connection to BTB, either directly or indirectly. (P90.)

80. At the time of the transfer of the refinery, Trigeant, Ltd. was insolvent, meaning that the sum of its debts was greater than all of its assets at a fair valuation.

**G.    The Transition Agreement**

81. After BTB's purchase of the refinery on March 4, 2008, Trigeant, Ltd. and BTB negotiated a Transition Agreement by which Trigeant, Ltd. operated the refinery on behalf of BTB for an administrative fee equal to 10% of the cost of the employees' compensation and benefits. (D58, D59, D60, D62, D64, D65, D69, D72, P162.)  BTB was also required to reimburse Trigeant, Ltd. for any expenditures incurred to maintain, improve, lease, and insure the land. (P162.)

82. Trigeant, Ltd. maintained its same employees, and there was little or no change in the management and operation of the refinery.

83. Trigeant, Ltd. refined its own petroleum stocks at the refinery during the transition period and fulfilled its existing contracts. (D45, D45a.)

84. BTB's Kevin Kirkeide managed any new contracts and new business.

85. The Transition Agreement expired on June 30, 2008, but Trigeant, Ltd. continued operating the refinery for BTB until September 8, 2008, when BTB foreclosed on all of Trigeant, Ltd.'s remaining property at the refinery.

86. After September 8, 2008, Trigeant, Ltd.'s employees were offered employment with BTB.  Steve Roos continued to serve as the manager of Trigeant, LLC, but was no longer in charge of the refinery's operations.

**H.    BTB's Foreclosure on Trigeant's Remaining Assets**

87. On February 7, 2008 (before the foreclosure on the refinery), Trigeant, Ltd. and BTB entered into an amendment to the Credit Agreement that granted Trigeant, Ltd. a $16 million line of credit secured by the same Trigeant, Ltd. assets as in the original Credit Agreement. (D48, D49.)

88. BTB loaned Trigeant, Ltd. $3,950,000 for operating expenses and capital improvements at the refinery.

89.  The capital improvements at the refinery included the installation of a new gas meter, the completion of a railcar unloading rack, and ongoing work on a truck loading rack. (P40.)

90.  After the March 4, 2008 foreclosure sale, Trigeant, Ltd. continued to own personal property located at the refinery, including equipment, accounts, contracts and the permits necessary to operate the refinery.

91.  On June 25, 2008, BTB proposed that Trigeant, Ltd. turn over all its remaining personal property and intangibles secured by the Amended Credit Agreement in full satisfaction of Trigeant Ltd.'s remaining debts and obligations to BTB. (D63, D66, D67.)

92.  Trigeant, Ltd. failed to respond to BTB's proposal.

93.  BTB gave Trigeant, Ltd. notice of its intent to foreclose on Trigeant Ltd.'s remaining assets. (D68, D73.)

94.  On September 8, 2008, BTB held a public auction at which it entered a credit bid for all of Trigeant, Ltd.'s remaining personal property and intangibles at the refinery. (D71.)

## I.  Value of the Refinery at the Time of the Transfer

95.  The Court received evidence of a wide range of values for the refinery.

96.  As a going concern and assuming the completion of certain capital improvements that were under way at the time of the transfer, the refinery was potentially worth $160 million.

97.  In 2006, Trigeant, Ltd. estimated the fair market value of the refinery at $68 million.

98.  On December 10, 2007, AmCap's Blacktop Report placed the break-up/liquidation value of the refinery at $27.6 million; the orderly liquidation value of the refinery at $30–40 million, depending on market conditions; the fair market value at $45 million; and the replacement cost at $74.6 million.

99.  The considerable variations in the estimates of the refinery's value are due to the variability of the factors considered—such as current market conditions, the time of the year, whether the refinery was being marketed as a going concern, whether the sale was voluntary or involuntary, and whether the refinery was intact and operational or shuttered and being sold off in pieces.

100. The Court finds the testimony of AmCap's corporate representative, Myung Yi, and the AmCap Blacktop Report credible and persuasive with regard to valuation. AmCap's decision to loan Trigeant, Ltd. $22 million was based primarily on its ability to recover its investment, if needed, through a forced sale of the refinery. In other words, AmCap had a strong incentive to provide an accurate, albeit conservative, valuation of the refinery.

101. Because Trigeant, Ltd. was in default on its loan and the refinery was in foreclosure, the Court finds that the proper valuation of the refinery at the time of the transfer was its liquidation value, not its fair market value.

102. The Court finds that, at the time of the transfer, the refinery had a value in excess of the lien.

**J.   Insider Status**

103. Harry Sargeant, III holds a 29.5% ownership interest in Trigeant Holdings, LLC.

104. Harry Sargeant, III's immediate family members (James Sargeant - brother, Daniel Sargeant - brother, and Harry Sargeant, II - father) hold the remaining ownership interest in Trigeant Holdings, LLC.

105. At the time of the transfer of the refinery, Harry Sargeant, III served as the manager of Trigeant Holdings, LLC. (D22.)

106. Trigeant Holdings, LLC is the general partner of and exerts full control over Trigeant Holdings, Ltd.

107. At the time of the transfer, Trigeant Holdings, Ltd. was 99% owned by Harry Sargeant, III and his immediate family members (James Sargeant, Daniel Sargeant, and Harry Sargeant, II).

108. At the time of the transfer, Trigeant Holdings, Ltd. owned 98.9% of Trigeant, LLC.  Accordingly, Trigeant Holdings, Ltd. controlled Trigeant, LLC.

109. Trigeant, LLC is the general partner of Trigeant, Ltd.  Accordingly, Trigeant, LLC exercised 100% control over Trigeant, Ltd.

110. In sum, Trigeant Holdings, LLC exerted control over Trigeant Holdings, Ltd., which in turn controlled Trigeant, LLC, which in turn controlled Trigeant, Ltd.

111.   The Trigeant, Ltd. equity holders, which consisted of Harry Sargeant, III, James Sargeant, Daniel Sargeant, and Harry Sargeant, II, were related, shared the same small office, and worked very closely together.

112.   The other Trigeant, Ltd. equity holders deferred to Harry Sargeant, III on issues regarding Trigeant, Ltd.'s management.  They had little interest in the operations of Trigeant, Ltd. and were not active in its management.

113.   Harry Sargeant, III had ultimate managerial responsibility for Trigeant, Ltd.'s operations and thus exerted control over Trigeant, Ltd. (P49.)

114.   Harry Sargeant, III possessed intimate knowledge of Trigeant, Ltd.'s business and financial affairs.

115.   Harry Sargeant, III was the 100% owner and sole member of BTB.

116.   Kevin Kirkeide served as BTB's manager and handled the company's day-to-day operations; however, Harry Sargeant, III had ultimate managerial control over BTB and directed Mr. Kirkeide with regard to BTB's important business decisions.

117.   Harry Sargeant, III sat on both sides of the transaction involving the transfer of the refinery from Trigeant, Ltd. to BTB.

## CONCLUSIONS OF LAW

**A.     The Court Has Personal Jurisdiction over Harry Sargeant, III**

1.     The Court concludes that it has specific jurisdiction over Harry Sargeant, III.

2.     In determining whether it may exercise personal jurisdiction over a defendant, a Court must consider (1) whether the defendant has sufficient minimum contacts with the forum state, and (2) whether the exercise of jurisdiction would offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945); *see also Alpine View Co. Ltd v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).

3.     For specific jurisdiction, minimum contacts may be established by demonstrating that the defendant purposefully directed his activities at the forum state and the plaintiff's cause of action arises out of these activities.  *See Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 413–14 (1984); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

4.     Harry Sargeant, III purposefully directed his activities at Texas, and this litigation results from damages that arise out of those activities:  he came up with the plan to purchase the Texas refinery after a foreclosure sale by AmCap (FF 35, 36, 40, 42, 44, 45); he formed BTB to purchase the refinery (FF 43); he then negotiated and ordered the purchase of the loan and lien from AmCap (FF 50, 51-54); and he controlled the foreclosure on the refinery through BTB (FF 58-65, 71-73).  The transfer of the refinery to BTB prevented Plaintiff from collecting on its Second Arbitration Award against Trigeant, Ltd.  Accordingly, Plaintiff has demonstrated that Harry Sargeant, III has sufficient minimum contacts with Texas. *See Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 728 (Tex. App. Houston [1st Dist.] 2005).

5.     Once a plaintiff establishes minimum contacts, the burden shifts to the nonresident defendant to show that asserting jurisdiction would not offend traditional notions of fair play and substantial justice. *Walk Haydel & Assocs.*, *Inc. v. Coastal Power Prod. Co.,* 517 F.3d 235, 245 (5th Cir. 2008); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999).  "In conducting the fairness inquiry, [courts] examine (1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies." *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 473 (5th Cir. 2006); *Wien Air Alaska*, 195 F.3d at 215.

6.     Texas has a significant interest in the subject matter of the litigation (the refinery), and bringing all defendants together in one action leads to a more efficient resolution of the controversies.  There is a burden on Harry Sargeant, III to litigate in Texas; however, the balance of interests favors this Court's exercise of jurisdiction over Harry Sargeant, III.

7.     The fiduciary shield doctrine does not apply in this case.  The Fifth Circuit has concluded that when an individual exerts such domination and control over a company that in reality they are the same, the exercise of jurisdiction over the individual is appropriate. *See Stuart v. Spademan*, 772 F.2d 1185, 1198 (5th Cir. 1985).  Additionally, where an individual acts in his own self-interest, rather than that of the corporation, he is not entitled to the protection of the fiduciary shield doctrine. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 902–03 (2d Cir. 1981).  Harry Sargeant, III was the 100% owner and sole member of BTB.  He had full control over BTB's operations and directed and controlled its decisions. Additionally, he acted in his own interest in facilitating and directing the transfer of the refinery to BTB (FF 6, 39-40, 42-46, 50-56, 114, 116).

8.     Accordingly Harry Sargeant, III's Motion for Judgment on Partial Findings (D.E. 232) is DENIED.

**B.**    **The March 4, 2008 Foreclosure Sale Constituted a Transfer of an Asset**

9.     TUFTA Section 24.002 provides definitions for several statutory terms which are relevant to the Court's inquiry into whether the March 4, 2008 foreclosure sale constituted a transfer of an asset.

> Transfer:  "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance. § 24.002(12)
> Asset:  "property of a debtor, but the term does not include . . . property to the extent it is      encumbered by a valid lien . . . ." § 24.002 (2).
> Valid Lien:  "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." § 24.002(13)

10.     An alleged fraudulent transfer of property is exempt from TUFTA "to the extent that such property is encumbered by a security interest that would be effective against a subsequent judicial lien." *Mullins v. Testamerica, Inc.*, 564 F.3d 386, 414 (5th Cir. 2009).

11.  When only part of a property's value is encumbered by a valid lien, the value the debtor maintains in the encumbered property in excess of the encumbering lien (the debtor's equity) constitutes an asset subject to TUFTA's anti-fraud provisions. *Telephone Equipment Network, Inc. v. TAS/Westchase Place, Ltd.*, 80 S.W.3d 601, 610, n.6 (Tex. Ct. App. 2002) (collecting cases).

12.  In determining whether property constitutes an asset, the Court considers the property's value at the time of the transfer. *See, e.g., United States ex. rel. Small Business Admin. v. Comm. Tech., Inc.,* 354 F.3d 378, 387 (5th Cir. 2003).

13.  Because the refinery was in foreclosure at the time of the transfer, in determining its value, the Court considers the property's liquidation value, not its fair market value.

14.  The Court found that, at the time of the transfer, the refinery had a liquidation value in excess of the lien (FF 102).  Therefore, the entire value of the refinery was not encumbered by a valid lien.

15.  The Court does not need to determine whether the debtor received less than reasonably equivalent value for the asset, as the TUFTA definitions of "transfer" and "asset" do not include the term reasonably equivalent value. §§ 24.002(2)&(12).

16.  The omission of reasonably equivalent value from the definitions of "transfer" and "asset" cannot be considered an accident. *See Chicago v. Envtl. Defense Fund*, 511 U.S. 328, 338 (1994) ("it is generally presumed that [a legislature] acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another" (quotations omitted)); *Laidlaw Waste Systems (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 659 (Tex. 1995) ("It is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose.  Likewise, we believe every word excluded from a statute must also be presumed to have been excluded for a purpose." (quotations and citations omitted)).

17.  The Court concludes that the foreclosure sale constituted a transfer of an asset.

**C.   Section 24.006(b):  Constructive Fraud - Insider Preference**

18.  TUFTA Section 24.006(b) prohibits a category of fraudulent transfers known as "insider preferences."

19. To establish a claim for constructive fraud under Section 24.006(b), a creditor must demonstrate the following elements:

      (1)    a transfer;

      (2)    to an insider;

      (3)    for an antecedent debt;

      (4)    insolvency of the debtor at the time of the transfer; and

      (5)    insider had reasonable cause to believe that the debtor was insolvent.

20. For Plaintiff to establish a claim for constructive fraud under Section 24.006(b), it must demonstrate that BTB was an insider of Trigeant, Ltd.

21. The test for determining insider status is to look at (1) the closeness of the relationship between the transferee (BTB) and debtor (Trigeant, Ltd.), and (2) whether the transfer constituted an arm's length transaction. *In re Holloway*, 955 F.2d 1008, 1010 (5th Cir. 1992); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 25 (Tex. App. – Tyler 2000, no pet.).

22. The Court first considers Harry Sargeant, III's relationship with Trigeant, Ltd. A person who exercises control over the debtor is always considered an insider. § 24.002(7)(C)(v). Harry Sargeant, III exercised control over Trigeant, Ltd. (FF 103-114).

23. A person's intimate knowledge of a partnership's business affairs is highly probative of an insider relationship. *See In re Wren Alexander Investments, LLC*, No. 08-52914-RBK, 2011 WL 748131, at *9–10 (Bankr. W.D. Tex. Feb. 23, 2011) (citing *Putman v. Stephenson*, 805 S.W.2d 16, 19 (Tex. App. Dallas 1991)). Harry Sargeant, III had intimate knowledge of Trigeant, Ltd.'s business and financial affairs (FF 114).

24. Another indicator of an insider relationship is when a person is a relative of the general partner or other person in control of the debtor. § 24.002(7)(C)(ii). In the case at hand, the Sargeant family owned Trigeant, Ltd. Harry Sargeant, III was not only an equity partner and in control of Trigeant, Ltd., but he was related to the other equity partners.

25. An arm's length transaction is a transaction between two unrelated and unaffiliated parties. *Black's Law Dictionary* 1635 (9th ed. 2009). In this case, Harry Sargeant, III sat on both sides of the transaction (FF 118) so the transfer of the refinery was between related and affiliated parties and thus not at arm's length.

26. Therefore, the Court concludes that Harry Sargeant, III was an insider of Trigeant, Ltd.

27.   The Court next considers BTB's relationship with Trigeant, Ltd.  BTB had a close relationship with Trigeant, Ltd. because its 100% owner and sole member was an insider of Trigeant, Ltd.  Harry Sargeant, III was in control of both BTB and Trigeant, Ltd. (FF 113-116).  BTB thus had intimate knowledge of Trigeant Ltd.'s business and financial affairs.  As stated above, the transfer of the refinery was not at arm's length.  Accordingly, the Court concludes that BTB was an insider of Trigeant, Ltd.

28.   The other constructive fraud factors—that the transfer was for an antecedent debt, that the debtor was insolvent at the time of the transfer, and that the insider had reasonable cause to believe the debtor was insolvent—were uncontested by Defendants.

29.   Plaintiff established by a preponderance of the evidence all the elements for a claim of constructive fraud under TUFTA Section 24.006(b).

**D.    Section 24.010(a)(3):  One-Year Statute of Limitations for Insider Preference**

30.   Under TUFTA, an action for constructive fraud under Section 24.006(b) "is extinguished unless action is brought . . . within one year after the transfer was made." § 24.010(a)(3).

31.   The foreclosure sale occurred on March 4, 2008.  Plaintiff did not file its Third Amended Complaint naming Harry Sargeant, III as a Defendant until July 23, 2010 (D.E. 120).  Thus, Plaintiff's constructive fraud claim against Harry Sargeant, III under Section 24.006(b) is untimely, unless Plaintiff can show that it relates back to the Original Complaint.

32.   Under FED. R. CIV. P. 15(c)(1)(C), a plaintiff who files suit within the limitations period may amend the complaint to change a defendant's name or substitute a correctly named defendant for one named by mistake, so long as (1) the amended complaint asserts a claim or defense arising out of the same conduct, transaction, or occurrence set out—or attempted to be set out—in the original complaint; (2) the newly named defendant had notice of the suit during the period for service of process under FED. R. CIV. P. 4(m); and (3) the newly named defendant knew or should have known that, but for a mistake, he would have been named within the applicable limitations period. *Krupski v. Costa Crociere S. p. A.*, --- U.S. ----, 130 S.Ct. 2485, 2496 (2010); *Jacobsen v. Osborne*, 133 F.3d 315, 319 (5th Cir. 1998).

33.   Plaintiff cannot satisfy the third element.  "Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing [its] original

complaint." *Krupski*, 130 S. Ct. at 2493.  In the case at hand, there is no evidence that Harry Sargeant, III knew or should have known that Plaintiff was targeting him as a defendant, or that he would have been named as a defendant but for a case of mistaken identity.

34.  Plaintiff's constructive fraud claim against Harry Sargeant, III under Section 24.006(b) is dismissed for failure to comply with the applicable statute of limitations.

**E.  Sections 24.005(a)(2) and 24.006(a):  Constructive Fraud**

35.  To establish a claim for constructive fraud under Sections 24.005(a)(2) and 24.006(a), a creditor must prove the following elements for each transaction:
    (1)  the transaction constituted a transfer;
    (2)  the debtor received less than reasonably equivalent value in exchange for the transfer; and
    (3)  one of the following:
        (i)  the debtor was insolvent at the time of the transfer or as a result of the transfer;
        (ii)  the debtor was left with unreasonably small capital after the transfer; or
        (iii)  at the time of the transfer, the debtor intended to incur debts beyond its ability to pay.

36.  Under TUFTA, "a person gives reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, non-collusive foreclosure sale . . . ." § 24.004(b); *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994).

37.  A debtor receives reasonably equivalent value for its property transferred through a foreclosure sale if the value received falls "within the range of values for which the transferor would have sold the assets in an arm's length transaction." § 24.004(d).

38.  Even if the foreclosure sale was collusive, the transfer of the refinery was for a value within the range of values for which the refinery would have sold in an arm's length transaction pursuant to § 24.004(d).

39.  The lowest price at which the refinery would have sold in a regularly conducted, non-collusive foreclosure sale is the outstanding loan balance of approximately $22.5 million.  In the foreclosure sale context, it is not uncommon for a foreclosing creditor to enter a "credit bid" equal to the outstanding balance of the

loan.  Thus, $22.5 million establishes the bottom end of the range of what would be considered a reasonably equivalent value for the refinery.

40.  Accordingly, Plaintiff's constructive fraud claim under TUFTA Sections 24.005(a)(2) and 24.006(a) fails.

## F.  Section 24.005(a)(1) and (b):  Actual Fraud

41.  To establish actual fraud under Section 24.005(a)(1), the creditor must prove by a preponderance of the evidence that the debtor made the allegedly fraudulent transfer with the "actual intent to hinder, delay, or defraud any creditor of the debtor."

42.  Section 24.005(b) provides a list of eleven nonexclusive badges of fraud that the Court may consider in determining whether the debtor acted with actual intent to defraud:

    (1)    the transfer or obligation was to an insider;

    (2)    the debtor retained possession or control of the property transferred after the transfer;

    (3)    the transfer or obligation was concealed;

    (4)    before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

    (5)    the transfer was of substantially all the debtor's assets;

    (6)    the debtor absconded;

    (7)    the debtor removed or concealed assets;

    (8)    the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

    (9)    the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

    (10)    the transfer occurred shortly before or shortly after a substantial debt was incurred; and

    (11)    the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

43.  The existence of several badges of fraud has been found to constitute an inference of fraud, a strong case of fraud, or to even shift the burden of proof to the defendant. *See, e.g.*, *Kelly v. Armstrong*, 141 F.3d 799, 802–03 (8th Cir. 1998) (holding that the presence of multiple badges of fraud shifts the burden to defendant to show by a preponderance of the evidence that it had a legitimate purpose in making the transfer); *Tex. Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299, 313 (Tex. App. 2009) ("An individual badge of fraud is not conclusive, but a concurrence of many badges in the same case will always make out a strong case

of fraud." (internal quotations and brackets omitted)); *In re SMTC Mfg. of Texas*, 421 B.R. 251, 300 (W.D. Tex. 2009) ("Proof of four to five badges of fraud has been found sufficient in several reported cases.").

44.     In the case at hand, the evidence supports a finding of at least seven of the statutory badges of fraud: the transfer was to an insider (FF 103–118, CL 27); the debtor retained possession or control over the property after the transfer for a period of time (FF 81-86); the transfer was concealed (FF 69, 70, 72, 75-79); before the transfer was made, the debtor had been sued or threatened with suit (FF 14); the transfer of the refinery constituted substantially all of the debtor's assets (FF 18); the debtor was insolvent or became insolvent shortly after the transfer was made (FF 80); and the transfer occurred shortly before a substantial debt (the Second Arbitration Award) was incurred (FF 15).

45.     The Court concludes that the debtor, Trigeant, Ltd., acted with actual intent to hinder, delay, or defraud Plaintiff.

**G.     Section 24.009(a):  Good Faith Defense**

46.     Under Section 24.005(a)(1), a transfer is not voidable against someone who took the property in good faith and for reasonably equivalent value. *See, e.g.*, *Phillips v. B.R. Brick and Masonry, Inc.*, 2010 WL 3564820, at *4 (Tex. App., 1st Dist. Houston, Sept. 10, 2010); *In re IFS Financial Corp.*, 417 B.R. 419, 441 (Bankr. S.D. Tex. 2009).

47.     BTB did not carry its burden with regard to the good faith element.  Consequently, BTB may not invoke the good faith defense.

**H.     TUFTA Remedies**

48.     TUFTA Section 24.008 provides the following remedies for creditors who have been defrauded under the Act:

>        (1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
>        (2) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings; or
>        (3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure:
>> (A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other

property;
(B) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or
(C) any other relief the circumstances may require.

49.     "TUFTA was designed to prevent a debtor from defrauding its creditors by moving assets out of reach. To accomplish that end, TUFTA permits a creditor, under certain circumstances, to set aside a debtor's fraudulent transfer of assets." *Wohlstein v. Aliezer*, 321 S.W.3d 765, 776 (Tex. App. Houston [14th Dist.] 2004) (internal citation omitted).

50.     "Setting aside a fraudulent transfer is an equitable remedy." *Jackson Law Office v. Chappell*, 37 S.W.3d 15, 26 (Tex. App. Tyler 2000).  A district court exercising its equitable powers must weigh the interests of the parties and the public in determining whether equitable relief should be granted. *Wenner v. Texas Lottery Comm'n*, 123 F.3d 321, 325 (5th Cir. 1998).

51.     The Court concludes that avoidance of the transfer is the most appropriate remedy in this case.  The Court is concerned about the effects of unwinding the transfer after more than four years.  However, given the evidence regarding the wide range of values for the refinery in a foreclosure situation, it would be speculative to set a value on the refinery at the time of the transfer.  Thus, a money judgment is not appropriate.

52.     The setting aside of a fraudulent transfer restores the debtor and creditor to their respective positions as they existed before the transfer and permits the creditor to enforce its legal rights against the debtor, as if no conveyance had ever been made. *First Nat. Bank of Detroit v. Skidmore*, 267 S.W. 1051, 1055 (Tex. App. Texarkana 1924).  Before the transfer, BTB had a lien on the refinery.  Plaintiff requests that BTB's lien be equitably subordinated to its claim.

53.     Equitable subordination elevates the status of the creditor against other claimants above what its position was at the time of the transfer.  The Fifth Circuit has enunciated a four-prong test for determining when equitable subordination is appropriate:

(1) the claimant [BTB] must have engaged in inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt [Plaintiff] or conferred an unfair advantage on the claimant [BTB]; (3) equitable subordination of the claim must not be inconsistent with the provisions of [TUFTA]; and (4) a claim should be subordinated only to the extent necessary to offset the harm

which the debtor or its creditors have suffered as a result of the
inequitable conduct.

*In re SI Restructuring, Inc.*, 532 F.3d 355, 360 (5th Cir. 2008); *In the Matter of
Cajun Elec. Power Co-op, Inc.*, 119 F.3d 349, 357 (5th Cir. 1997); *In re Mobile
Steel Corp.*, 563 F.2d 692, 700 (5th Cir. 1977) (internal citations omitted).

54.  At the time BTB purchased the loan and lien from AmCap, AmCap was in the
     process of foreclosing on the refinery.  Had BTB not purchased the loan from
     AmCap, AmCap would have foreclosed on the refinery and any recovery by
     Plaintiff on the Second Arbitration Award would have been limited to the value
     received by AmCap in excess of the outstanding loan balance at the time of the
     foreclosure sale.  Because a claim should be subordinated only to the extent
     necessary to offset the harm which the creditor suffered, the Court concludes that
     Plaintiff is not entitled to the equitable subordination of BTB's lien on the
     refinery.

55.  The Court declines to consider Plaintiff's sham to perpetrate a fraud claim, which
     sought to impose joint and several liability on all Defendants for the entire amount
     of the Second Arbitration Award, because the Court has concluded that a money
     judgment is not appropriate in this case.

## CONCLUSION

For the reasons stated above, the Court concludes that the transfer of Trigeant,

Ltd.'s Corpus Christi refinery to BTB violated TUFTA, and Plaintiff is entitled to entry

of judgment in its favor.  The Court orders that the fraudulent transfer be set aside and

ownership of the refinery be returned to Trigeant, Ltd.  The Court will set a hearing to

address attorney fees.

ORDERED this 7th day of August, 2012.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE